COURT OF APPEALS
DECISION
DATED AND FILED

February 27, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.        **2022AP514**

STATE OF WISCONSIN

Cir. Ct. No.  2020CV162

IN COURT OF APPEALS
DISTRICT III

TJ PROP, LLC,

   PLAINTIFF-APPELLANT,

 V.

TIM MUELLER MASON CONTRACTOR, LLC, CRIVITZ LUMBER, LLC, ESTATE OF JEFFRY ZAHORIK D/B/A JEFFRY Z CONSTRUCTION AND INTEGRITY INSURANCE,

   DEFENDANTS-RESPONDENTS.

APPEAL from an order of the circuit court for Marinette County: JANE M. SEQUIN, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

¶1      GILL, J.   TJ Prop, LLC, entered into separate contracts with various entities for the construction of a custom-built house.  Ultimately, TJ Prop sued all but one of those entities, claiming, among other things, that they did not use the

correct house wrap as required by the contracts and that this failure caused water to seep into the house and behind the walls over a period of several years. Specifically, TJ Prop alleged negligence claims against Tim Mueller Mason Contractor, LLC (Mueller), Crivitz Lumber, LLC (Crivitz), and the Estate of Jeffry Zahorik (d/b/a Jeffry Z Construction) (Jeffry Z)[1]; breach of contract and warranty claims against Mueller and Jeffry Z; and misrepresentation and fraud claims against Crivitz.

¶2     Jeffry Z and Crivitz filed separate motions to dismiss, arguing that TJ Prop's tort claims were barred by the economic loss doctrine. They also asserted that TJ Prop's contract claims were time barred under the applicable statute of limitations. Alternatively, they argued that the statute of repose barred all of TJ Prop's claims. Similarly, Mueller filed a motion for summary judgment, raising the same legal arguments as Jeffry Z and Crivitz. The circuit court granted all three motions against TJ Prop, concluding that the economic loss doctrine barred the tort claims and that the remaining contract claims were untimely filed.[2]

---

[1] Jeffry Zahorik was the sole proprietor of Jeffry Z, and he passed away in 2009. Therefore, TJ Prop filed this action against his estate.

According to the amended complaint, Integrity Insurance insured Jeffry Z at the time of the house's construction. On appeal, Integrity states that it also insured Crivitz and that Integrity adopts the arguments raised by Jeffry Z and Crivitz.

[2] TJ Prop does not challenge that portion of the circuit court's order determining that TJ Prop's contract claims (breach of contract and warranty) against Mueller and Jeffry Z are time barred. Similarly, TJ Prop does not challenge that portion of the court's order dismissing its tort claims (negligence, misrepresentation, and fraud) against Crivitz. Therefore, we affirm the court's order with respect to the unchallenged decisions on these claims. *See Techworks, LLC v. Wille*, 2009 WI App 101, ¶25, 318 Wis. 2d 488, 770 N.W.2d 727 ("On appeal, issues raised but not briefed or argued are deemed abandoned." (citation omitted)).

¶3      On appeal, TJ Prop argues that the economic loss doctrine does not bar its negligence claims against Mueller and Jeffry Z because TJ Prop was not a general contractor, and we should therefore consider its contracts with Mueller and Jeffry Z in isolation.  In doing so, TJ Prop asserts that it is clear the contracts with Mueller and Jeffry Z were either primarily or exclusively for the provision of services, not for the provision of a product.  As such, TJ Prop contends that the economic loss doctrine does not apply to bar its negligence claims.  *See **Insurance Co. of N. Am. v. Cease Elec., Inc.***, 2004 WI 139, ¶52, 276 Wis. 2d 361, 688 N.W.2d 462 ("[T]he economic loss doctrine is inapplicable to claims for the negligent provision of services.").  We conclude that TJ Prop hired the entities to construct a house, thus making TJ Prop a de facto general contractor with the ultimate purpose of building a house.  As such, although both contracts with the two entities involved some services, they were entered into for the purpose of completing part of what would become a finished product, a house.  Therefore, we conclude that the economic loss doctrine bars TJ Prop's negligence claims against Mueller and Jeffry Z.

¶4      In addition, TJ Prop contends that Crivitz should be equitably estopped from asserting a statute of limitations defense to TJ Prop's "breach of contract" claim against Crivitz.  TJ Prop did not allege a contract claim against Crivitz and, therefore, the issue of whether any such claim against Crivitz was time barred is not before us on appeal.  Regardless, even if TJ Prop had alleged a breach of contract claim against Crivitz, TJ Prop forfeited an equitable estoppel argument by not raising it in the circuit court.  In all, we affirm the court's order granting Jeffry Z's and Crivitz's respective motions to dismiss and Mueller's motion for summary judgment.

**BACKGROUND**

¶5      In 2007 and 2008, TJ Prop sought to build a house.  To do so, it entered into four contracts, one each with: (1) Crivitz for the materials; (2) Jeffry Z for carpentry services; (3) Mueller for masonry services; and (4) James Marriott & Associates for architectural plans.  In 2020, TJ Prop sued Crivitz, Jeffry Z, and Mueller based on alleged deficiencies in the house's construction.

¶6      According to an amended complaint, TJ Prop's contract with Crivitz required that "Tyvek brand house wrap be used in the construction" of the house in accordance with the architectural plans.  TJ Prop alleged that Crivitz "failed to provide Tyvek house wrap and instead substituted its own branded house wrap."

¶7      Furthermore, TJ Prop alleged that its contract with Jeffry Z required Jeffry Z to follow the architectural plans, which specified that Tyvek brand house wrap and "30# Felt behind all stone/masonry" would be used in the construction of the house.  According to TJ Prop, Jeffry Z knew or should have known that the house wrap Crivitz ultimately provided was not Tyvek.  TJ Prop alleged, among other deficiencies, that Jeffry Z installed the Crivitz branded house wrap and did not install the specified "30# Felt."

¶8      TJ Prop alleged that its contract with Mueller required Mueller to follow the architectural plans in a "substantial workmanlike manner."  TJ Prop also alleged, among other deficiencies, that Mueller failed to follow the proper building codes or used the Tyvek house wrap.

¶9      According to TJ Prop, the deficiencies by all three entities "caused water to seep into the house and behind the walls over a period of several years,"

leading to "[e]xtensive mold and water damage," discovered in 2019, and totaling more than $250,000 in damages. TJ Prop alleged that a forensic examination of the house concluded that "water had penetrated the house wrap and might have been a contributing factor to the damage."

¶10     Jeffry Z and Crivitz filed separate motions to dismiss TJ Prop's complaint for failure to state a claim upon which relief could be granted. They argued that the economic loss doctrine barred TJ Prop from succeeding on its negligence claims; that the contract claims were time barred by WIS. STAT. § 893.43(1) (2021-22)[3]; and, alternatively, that the construction statute of repose, *see* WIS. STAT. § 893.89(2), barred all of TJ Prop's claims against it. Similarly, Mueller filed a motion for summary judgment, raising the same legal arguments as Jeffry Z and Crivitz.

¶11     Following a motion hearing, the circuit court granted all three defendants' motions. The court determined that the economic loss doctrine barred all of TJ Prop's tort claims and that WIS. STAT. § 893.43(1) barred the remaining contract claims. The court further concluded that WIS. STAT. § 893.89 did not extend the time limit for the contract claims to be filed. TJ Prop now appeals.

## DISCUSSION

¶12     On appeal, TJ Prop first challenges the circuit court's decision that the economic loss doctrine barred its negligence claims against Mueller and

---

[3] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

Jeffry Z. Second, TJ Prop argues that Crivitz should be equitably estopped from asserting a statute of limitations defense.

¶13    Our review of the circuit court's order granting the motions to dismiss and motion for summary judgment implicates two separate but similar legal standards. A motion to dismiss pursuant to WIS. STAT. § 802.06(2)(a)6. should be granted if the complaint fails to "plead facts, which, if true, would entitle the plaintiff to relief." *Data Key Partners v. Permira Advisers LLC*, 2014 WI 86, ¶21, 356 Wis. 2d 665, 849 N.W.2d 693. "When we review a motion to dismiss, factual allegations in the complaint are accepted as true for purposes of our review. However, legal conclusions asserted in a complaint are not accepted, and legal conclusions are insufficient to withstand a motion to dismiss." *Id.*, ¶18 (citation omitted).

¶14    Similarly, summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2). "We construe all facts and reasonable inferences in the nonmoving party's favor." *Johnson v. Mt. Morris Mut. Ins. Co.*, 2012 WI App 3, ¶8, 338 Wis. 2d 327, 809 N.W.2d 53 (2011). We review a circuit court's ruling on both motions de novo.[4]    *See Data Key Partners*, 356 Wis. 2d 665, ¶17 (motion to

---

[4] TJ Prop argues on appeal that the circuit court "failed to apply the correct standard of review" when addressing the motions to dismiss and the motion for summary judgment. However, because we review these motions de novo, we need not address whether the court applied the correct standard.

6

dismiss); ***AKG Real Est., LLC v. Kosterman***, 2006 WI 106, ¶14, 296 Wis. 2d 1, 717 N.W.2d 835 (motion for summary judgment).

## I. The economic loss doctrine bars TJ Prop's negligence claims against Mueller and Jeffry Z.

¶15 The economic loss doctrine states that a "purchaser of a product cannot recover from a manufacturer on a tort theory for damages that are solely economic." ***Bay Breeze Condo. Ass'n, Inc. v. Norco Windows, Inc.***, 2002 WI App 205, ¶9, 257 Wis. 2d 511, 651 N.W.2d 738. "Therefore, when contractual expectations are frustrated because of a defect in the subject matter of the contract and the only damages are economic losses, the exclusive remedy lies in contract." ***Id.*** "Economic loss is the loss in a product's value which occurs because the product 'is inferior in quality and does not work for the general purposes for which it was manufactured and sold.'" ***Wausau Tile, Inc. v. County Concrete Corp.***, 226 Wis. 2d 235, 246, 593 N.W.2d 445 (1999) (citation omitted).

¶16 The doctrine "applies to only contracts for products, not to contracts for services." ***Trinity Lutheran Church v. Dorschner Excavating, Inc.***, 2006 WI App 22, ¶22, 289 Wis. 2d 252, 710 N.W.2d 680. Furthermore, the "doctrine does not preclude a product purchaser's claims of … damage to property other than the product itself." ***Wausau Tile***, 226 Wis. 2d at 247.

¶17    TJ Prop does not allege damage to "other property."[5]    Rather, TJ Prop argues that its contracts with Mueller and Jeffry Z were either primarily or exclusively for the provision of services, not for the provision of a product. Conversely, Mueller and Jeffry Z assert that their respective contracts were for predominately a product, not for services.  In a situation where there is a dispute over whether a contract is primarily for services or primarily for product, we apply the "predominant purpose test" to determine whether the contract is "predominantly a sale of a product and therefore subject to the economic loss doctrine, or predominantly a contract for services and therefore not subject to the economic loss doctrine."  *Linden v. Cascade Stone Co.*, 2005 WI 113, ¶8, 283 Wis. 2d 606, 699 N.W.2d 189 (citations omitted).  We consider the totality of the circumstances when applying the test.  *Kalahari Dev., LLC v. Iconica, Inc.*, 2012 WI App 34, ¶25, 340 Wis. 2d 454, 811 N.W.2d 825.

¶18    In *Linden*, our supreme court analyzed whether the economic loss doctrine applied to a situation where property owners entered into a contract with a general contractor to build a new house.  *Linden*, 283 Wis. 2d 606, ¶2.  The contractor, Groveland Craftsman, Inc., "retained various subcontractors to assist in the house's construction," including Cascade Stone Company, Inc., and Allied Construction.  *Id.*  Cascade was hired to apply exterior stucco to the house, and Allied was hired to shingle the house's roof.  *Id.*  Ultimately, the property owners

---

[5] Jeffry Z argues on appeal that the economic loss doctrine applies under the integrated systems limitation to prevent TJ Prop's claims.  Under the integrated systems limitation, "[d]amage by a defective component of an integrated system to either the system as a whole or other system components is not damage to 'other property' [that would preclude] the application of the economic loss doctrine."  *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 246, 249, 593 N.W.2d 445 (1999) (citation omitted).  TJ Prop is not arguing that damages occurred to "other property," and, therefore, we need not address the integrated systems limitation.

sued Groveland, Cascade, and Allied, alleging that all three entities negligently performed their services, which defects led to water infiltration. *Id.*, ¶3. The circuit court granted Cascade and Allied's motions for summary judgment, holding that the economic loss doctrine barred the tort claims against the subcontractors. *Id.*, ¶4.

¶19    On appeal, our supreme court determined that the economic loss doctrine prevented the property owners from pursuing their tort claims against Cascade and Allied because "the predominant purpose of the contract was for a product, a new house, rather than one for services." *Id.*, ¶25. In doing so, the court outlined relevant objective and subjective factors to consider when determining whether a contract is predominantly for goods or for services. *Id.*, ¶¶21-22. Those factors include the quantitative costs of services versus materials, the language of the contract, the nature of the business of the supplier, the circumstances of the parties, and the primary objective the parties hoped to achieve by entering into the contract. *Id.*, ¶¶21-23.

¶20    Regarding the quantitative cost of services versus materials, the supreme court determined that it was "impossible to separate the cost of the materials from the cost of the services" because the contract used language that "mixe[d] materials and services." *Id.*, ¶23.

¶21    The supreme court then turned to the subjective language of the contract, which it characterized as including "a mixture of service and product words." *Id.*, ¶¶24-25. The contract began by outlining the specifications of the project, stating, "Construct a new two[-]story home." *Id.*, ¶25. Further, the contract stated that the project's cost was billed using a "fixed price contract," and the cost would only change if there were changes to the project's specifications,

not "based on the hours worked." *Id.* According to the court, the fixed price and changed price provision demonstrated that "the parties bargained for costs based on the specifications of the house, not the amount of work put into completion of the project." *Id.* The court also concluded that "the primary reason the [plaintiffs] entered into the contract was to have a house custom built." *Id.* In all, the court determined that the predominant purpose of the contract was for a product, a new house, rather than for services. *Id.*

¶22 Conversely, in *Cease*, our supreme court applied the predominant purpose test and determined that a contract to upgrade a ventilation system inside of an existing barn was a contract for services, not for a product. *Cease*, 276 Wis. 2d 361, ¶¶2-3. Specifically, Cold Spring Egg Farm, Inc., which operated a poultry farm, hired Cease Electric, Inc., to replace the barn's manual ventilation system with an automatic ventilation system. *Id.*, ¶¶3, 5. The "'brains' of the new ventilation system was the main fan control unit" that Cold Spring purchased from another company. *Id.*, ¶6. The main fan control unit came with a wiring schematic, and, based on that diagram, Cold Spring asked Cease to "wire the ventilation system's component parts, including the primary fan control and [a] backup thermostat." *Id.*, ¶7. Later, the system failed, and Cold Spring sued Cease, alleging that it negligently installed the system. *Id.*, ¶10.

¶23 The supreme court concluded that the contract between Cold Spring and Cease was one for services. *Id.*, ¶18. As the court explained, the other company was the entity that created the ventilation system in the barn, not Cease. "All Cease was required to do was to follow the one-page wiring schematic to ensure that the controller was properly wired to ventilation fans and a power source." *Id.* Similarly, the court reasoned that Cease did not "manufacture[]"

Cold Spring's ventilation system—it was a "sophisticated" unit that Cease, as one employee testified, "simpl[y]" wired to the barn. *Id.*, ¶20.

¶24 Further, the supreme court established that Cold Spring did not pay Cease a "one-time fee for the price of a 'system.' Rather, the electricians who did the work for [Cease] kept time sheets and billed their time out on an hourly basis." *Id.*, ¶19. Lastly, the court stated that "although [Cease] claims to have furnished additional component parts for Cold Spring's system, there is no evidence in the record to support this contention." *Id.*, ¶21. The only evidence of any "product" provided by Cease came from an exhibit, which "reference[d] merely conduit and wiring." *Id.* Accordingly, the court concluded that the contract in question was for services and determined that Cold Spring's negligence claim against Cease was not precluded under the economic loss doctrine. *Id.*, ¶53.

¶25 Applying the predominant purpose test, we conclude that TJ Prop's negligence claims against Mueller and Jeffry Z are barred by the economic loss doctrine. The contract between TJ Prop and Mueller provided:

> [Mueller] hereby proposes to furnish the materials (listed below) and perform the labor necessary for the completion of stone on house, garage, and fireplace interior and exterior. [Mueller is] supplying wall ties, screws and mason sand along with labor for approximately 2,700 to 3,000 square ft. of stone. [Mueller is] to be reimbursed for any materials [it] buy[s] that are not listed above. Labor includes washing of stone.
>
> All material is guaranteed to be as specified. The above work is to be performed in accordance with the specifications submitted for the above work. The work is to be completed in a substantial workmanlike manner for the amount of $30,000.00.
>
> ….
>
> Any alterations or deviations from above specifications involving extra costs will be executed only upon written

11

order and will become an extra charge over and above the original estimate.…

The "specifications" were a "set of architectural plans" for the house provided by James Marriott & Associates to TJ Prop. An affidavit submitted by TJ Prop with its brief in opposition to Mueller's motion for summary judgment stated that Mueller paid for "[l]ess than $200 worth of material," including "wall ties, screws, and mason sand."

¶26     With respect to the contract between TJ Prop and Jeffry Z, the relevant allegations in the amended complaint[6] stated:

> 10. [Jeffry Z] presented a proposal for carpentry services for the construction of the Project.… [A] revised proposal was accepted by … Jeffry Z …. At no time was Jeffry Z a general contractor for the Project.
>
> 11. The [contract] was based on the Plans provided by [TJ Prop], [and] specified that Jeffry Z would follow the Plans, which Plans specified that Tyvek brand house wrap would be used for the construction of the Project along with 30# Felt behind all stone/masonry.
>
> 12. The [contract] specified four specific projects, with an optional fifth. The [contract] included the parenthetical (Labor only) after each of the listed projects: (i) frame house according to plans (Labor only); (ii) install windows and doors (Labor only); (iii) install aluminum soffit and facia (Labor only); (iv) install siding (Labor only); and (optional) (v) install deck (Labor only) and install screen

---

[6] Both TJ Prop and Jeffry Z direct us to the actual contract submitted to the circuit court via affidavit with Jeffry Z's motion to dismiss. When a "defendant attaches affidavits or other matters outside the pleadings to its motion to dismiss and the court, in its discretion, considers these outside matters, the court must convert the defendant's motion into one for summary judgment." *Alliance Laundry Sys. LLC v. Stroh Die Casting Co.*, 2008 WI App 180, ¶14, 315 Wis. 2d 143, 763 N.W.2d 167. There is no evidence before us demonstrating that the court considered the contract or converted Jeffry Z's motion to dismiss into a motion for summary judgment. As such, we will not consider the affidavit, and we confine our review to the amended complaint. *See* **Data Key Partners v. Permira Advisers LLC**, 2014 WI 86, ¶21, 356 Wis. 2d 665, 849 N.W.2d 693.

porch (Labor only). Any and all extras, revisions, additions were billed on an hourly basis for labor only. TJ Prop paid for all the materials directly.

13. Crivitz made multiple deliveries of materials, all as directed by Jeffry Z. TJ Prop contracted with Crivitz for purchase of the materials, but Jeffry Z contacted Crivitz directly to instruct which materials would be delivered to the Project site and when. There was no general contractor for the Project.

¶27 TJ Prop argues that neither of the contracts with Mueller and Jeffry Z "promised a final product" or "had [as] its primary object the purchase of any sort of tangible product or goods." With regard to the contract with Jeffry Z, TJ Prop contends that the contract involved "entirely services." Similarly, with regard to the contract with Mueller, TJ Prop asserts that the contract involved "predominantly services."

¶28 The contracts in question here differ slightly from the contracts in *Linden* and *Cease*. Here, it appears that neither contract provided for a substantial amount of materials, if any, to be supplied by the subcontractors, making the contracts more similar to that in *Cease*. Although the Mueller contract stated that Mueller would furnish materials, including mason sand, Mueller purportedly spent only $200 on materials. The Jeffry Z contract did not state that Jeffry Z would supply any materials and, in fact, stated that the contract was for labor only.

¶29 Yet, both contracts with TJ Prop were entered into for the purposes of completing part of what would become a finished house, making this situation more like *Linden* than *Cease*. That is, the "primary reason [TJ Prop] entered into the contract[s] was to have a house custom built." *See Linden*, 283 Wis. 2d 606, ¶25. Both contracts provided that Mueller and Jeffry Z were provided the architectural plans for the house and that all work would be completed in

13

accordance with those plans. In this case, Mueller installed stone in certain areas, and Jeffry Z provided carpentry services.

¶30 Furthermore, and importantly, both contracts were for a fixed price that was not broken down into services and materials. The contracts used language that "mixe[d] materials and services." *See id.*, ¶23. Hence, like in *Linden*, the subcontractors here were providing labor for a fixed price, which demonstrates that the parties "bargained for costs based on the specifications of the house, not the amount of work put into completion of the project." *See id.*, ¶25. The contracts thus differ from the contract in *Cease*, which was for labor only at an ongoing price determined by the hours worked. Therefore, despite the fact that both contracts provided for some services, those services were related specifically to the construction of the house—a product—and were contractually priced that way.[7]

---

[7] TJ Prop asks this court to apply the holding in *Trinity Lutheran Church v. Dorschner Excavating, Inc.*, 2006 WI App 22, 289 Wis. 2d 252, 710 N.W.2d 680. *Trinity Lutheran Church* is inapposite to this case, however, because the construction company in that case, Oudenhoven Construction, Inc. (OCI), did not introduce its contract into the record even after a jury trial. *Id.*, ¶25. We held that

> [b]ecause the economic loss doctrine is in the nature of an affirmative defense against a claim based in tort, we conclude that it was OCI's burden to introduce its contract with Trinity and to demonstrate that its predominant purpose was to supply Trinity with a product, not with services. OCI has not met this burden on the present record, and thus, we cannot conclude that the Trinity-OCI contract was predominantly one for other than construction coordination services, as the [circuit] court concluded.

*Id.* Because we never reached the application of the predominant purpose test in *Trinity Lutheran Church*, we do not find any assistance from the analysis of that case here.

¶31    TJ Prop asserts that we should not consider the house as a final product because TJ Prop "never entered into any contract for a completed home." In other words, TJ Prop argues that, unlike in *Linden*, there was no general contractor in this case, and we should consider the contracts in isolation of one another—not as an entire project.

¶32    Prior to applying the predominant purpose test, the court in *Linden* contemplated what contract it would consider—the contract between the property owners and the general contractor or the contracts between the general contractor and the subcontractors. *Linden*, 283 Wis. 2d 606, ¶12. The court determined that the contract in question was the contract between the property owners and the general contractor. *Id.*, ¶17. The court reasoned, "[A]t its core, the [property owners'] complaint is that the house they received is not the house for which they contracted." *Id.* "Allowing [them] to maintain a tort claim against the subcontractors for services rendered to the general contractor would undermine the distinction between contract law and tort law that the economic loss doctrine seeks to preserve." *Id.*

¶33    Here, TJ Prop itself essentially worked as the "general contractor" for the house and hired various "subcontractors" to complete the house. In that sense, there was no "vertical privity" between all of the parties. *See Trinity Lutheran Church*, 289 Wis. 2d 252, ¶19. Instead, the parties' position "with respect to each other is better analogized to that of successive spokes in a wheel, with [TJ Prop] at the hub. The contractual obligations of each ran exclusively to [TJ Prop], not to one another." *See id.*

¶34    Nevertheless, the lack of "vertical privity" under the facts of this case does not change our application of the predominant purpose test outlined

15

above. Although the economic loss doctrine does not bar all tort claims arising out of contracts entered into with a home builder as a general contractor, here, all of the contracts were entered into to complete the final product for TJ Prop. The "purchaser … is in the best position to bargain for coverage of the risk of faulty workmanship in any part of the house." *Linden*, 283 Wis. 2d 606, ¶17. "[A]t its core, [TJ Prop's] complaint is that the house [it] received is not the house for which [it] contracted." *See id.*

¶35 Under the facts of this case, allowing TJ Prop to maintain negligence claims against the "subcontractors" for services rendered to produce a house "would undermine the distinction between contract law and tort law that the economic loss doctrine seeks to preserve." *See id.* It would essentially permit TJ Prop to evade the economic loss doctrine by hiring several subcontractors regardless of the legal conclusion that the predominant purpose of those contracts was for the construction of a product. *See id.*, ¶7 (explaining that the economic loss doctrine "seeks to avoid drowning contract law in 'a sea of tort'" (citation omitted)).

¶36 For all of the foregoing reasons, we affirm the circuit court's decision granting Mueller's motion for summary judgment and Jeffry Z's motion to dismiss.

## II. TJ Prop forfeited its argument that the circuit court erred by dismissing its "breach of contract" claim against Crivitz on statute of limitations grounds.

¶37 Lastly, TJ Prop argues that the circuit court erred by concluding that its "breach of contract" claim against Crivitz was time barred pursuant to Wis. Stat. § 893.43(1). TJ Prop claims that principles of equitable estoppel must

apply to prevent Crivitz from asserting a statute of limitations defense. This argument fails for two reasons.

¶38   First, TJ Prop did not allege a "breach of contract" claim against Crivitz. The only contract claims alleged were those against Mueller and Jeffry Z. We note, however, that Crivitz litigated the matter in the circuit court as if TJ Prop had alleged a breach of contract claim against it. Namely, Crivitz argued that the breach of contract claim against it was time barred under either WIS. STAT. §§ 893.43 or 893.89. On appeal, Crivitz attempts to correct this error and argues that no such claim was filed against it. TJ Prop does not respond to this argument. We therefore deem TJ Prop to have conceded that it did not assert a breach of contract claim against Crivitz. *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (unrefuted arguments may be deemed conceded).

¶39   Second, even if TJ Prop did plead a breach of contract claim against Crivitz, TJ Prop failed to raise an equitable estoppel argument in the circuit court, and, therefore, we deem the issue forfeited and, accordingly, unable to be raised on appeal. *See Thompson v. Ouellette*, 2023 WI App 7, ¶13, 406 Wis. 2d 99, 986 N.W.2d 338 ("The rule against forfeiture gives the parties and the [circuit] court notice and a fair opportunity to address issues and arguments, enabling courts to avoid or correct any errors with minimal disruption of the judicial process."). Consequently, we will not consider TJ Prop's equitable estoppel argument on appeal, and we affirm the court's grant of Crivitz's motion to dismiss for failure to state a claim.

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.